UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,


        -v-                              23-CR-307 (LJL)

MICHAEL SHVARTSMAN, ET. AL.,

                        Defendants.

-----------------------------------------------------------------X


### DEFENDANT GERALD SHVARTSMAN'S
### SENTENCING MEMORANDUM


SERCARZ & RIOPELLE, LLP
950 Third Avenue, 31st Floor
New York, NY  10022
(212) 586-4900

*Attorneys for Defendant*
*Gerald Shvartsman*

## PRELIMINARY STATEMENT

Defendant Gerald Shvartsman ("Shvartsman" or "Defendant") respectfully submits this memorandum in aid of his sentencing.  Although the Presentence Report ("PSR") includes an accurate description of Mr. Shvartsman's background and the offense at issue, the Defendant submits this memorandum to provide additional detail regarding these matters, so that the Court will have a fully nuanced picture of Mr. Shvartsman as a well-established businessman in his community, and a fully detailed description of his life when it imposes sentence on him.  As is demonstrated more fully below, and in the many letters written by members of Mr. Shvartsman's family and friends in support of him at this difficult time, Mr. Shvartsman is much more than the conduct he stands convicted of in this case.

Moreover, there are a variety of factual issues that the Court should consider when imposing sentence on Mr. Shvartsman, which will be fully addressed below.  These issues include Mr. Shvartsman's lack of sophistication in the securities markets, and his relatively modest role in the offense conduct charged in the indictment; the significant damage a lengthy sentence of incarceration would do to Mr. Shvartsman's business and its employees, many of whom Mr. Shvartsman has given a second chance to live productive and decent lives as they rehabilitate themselves after serving their own sentences of incarceration; the significant illnesses Mr.

Shvartsman is struggling with, which are best treated outside the walls of the Bureau of Prisons; and the effect of Mr. Shvartsman's conviction on his immigration status, and on any sentence of incarceration he will be required to serve.

We ask the Court to consider these facts, and the details described below, as it weighs the sentence it will impose. For all the reasons indicated herein, Mr. Shvartsman respectfully requests that the Court impose a sentence below the applicable Sentencing Guidelines' sentencing range. With a full and fair appraisal of the facts before it, the Defendant respectfully requests that the Court impose a sentence that does not include a period of incarceration. Instead, Mr. Shvartsman submits that a period of home confinement should be substituted for incarceration here. In combination with the hefty forfeiture judgment the Court must enter against Mr. Shvartsman, a sentence of home confinement is sufficient, but not greater than necessary, to comply with the Court's sentencing obligation to impose a holistic and just sentence, based on the relevant factors listed in 18 U.S.C. Section 3553(a).

## STATEMENT OF FACTS

### A.    Procedural History

As the PSR notes, Mr. Shvartsman was arrested on June 29, 2023, and released on a Personal Recognizance Bond with a condition of Pre-trial

Supervision. PSR, p. 1. He has attended all required Court hearings and has complied with his bail restrictions at all times. PSR, p. 7.[1]

The indictment against Mr. Shvartsman charges him with three counts of securities fraud, and one count of conspiring to commit securities fraud. PSR, page 3-4. On April 3, 2024, well before the scheduled trial date, Mr. Shvartsman pled guilty to a single count of securities fraud in full satisfaction of the charges against him, pursuant to a written plea agreement with the government. PSR, page 6. As memorialized in Mr. Shvartsman's plea agreement and the PSR, the government, the defendant and the Probation Department all agree that the defendant's prompt decision to plead guilty permitted the government to avoid preparing for trial and permitted the Court to allocate its resources efficiently, such that the defendant is entitled to a three-point downward adjustment in his sentencing guidelines for acceptance of responsibility.  PSR, pages 6, 15.  All parties also agree that Mr. Shvartsman qualifies for the downward adjustment provided in sentencing guidelines Section 4C1.1, because he has no criminal history and was not a manager or supervisor of any illegal activity. Id.

---

1. After pleading guilty, Mr. Shvartsman's Pretrial Services Officer approached him and offered the Defendant "services" in connection with his sentencing, apparently seeking a payment from the Defendant.  Mr. Shvartsman was concerned about this, and he reported his conversation to the government, which investigated the situation.  We understand the government will inform the Court of its findings at the time of Mr. Shvartsman's sentence.

Throughout the sentencing process, the Defendant has been completely cooperative with the Probation Department, responding to inquiries from the Probation Officer who prepared his PSR, and updating information relevant to the sentencing proceedings whenever new facts became available. On July 12, 2024, the Probation Department provided Mr. Shvartsman with its initial draft of the PSR, and on July 25, 2024, Mr. Shvartsman timely submitted his objections and corrections to the PSR. A copy of the Defendant's objections and corrections to the PSR is attached for the Court's information as Exhibit A. The final PSR was disclosed on September 16, 2024, together with the Probation Department's recommendation of a sentence of incarceration of a year and a day.  PSR, page 37.

The Probation Office's recommendation of incarceration for a year and a day is a thoughtful and merciful one.  In a typical case, such a sentence would result in a period of incarceration of approximately six months, after calculating the Defendant's good time benefit, and allowing for release to a halfway house and home confinement with six months left to serve on the sentence imposed.  In effect, the Probation Department's recommendation amounts to a recommendation of a six-month sentence in the typical case. But this is not a typical case, for a number of reasons. For example, because Mr. Shvartsman is not an American citizen, he cannot be housed in a

minimum-security camp facility, and he cannot be released to a halfway house or home detention with 6 months remaining on his sentence. Thus, for Mr. Shvartsman, a sentence of 366 days is just not the same for him as it would be for an American citizen – if sentenced to "a year and a day," Gerald will serve more than 300 days of incarceration at a federal prison facility, not the 180 days at a camp that a US Citizen would serve before release to a halfway house or home detention. Many of the BOP programs available to inmates will not be available to the Defendant while he is incarcerated, and Gerald will not be able to further reduce his sentence, or make it more palatable, through participation in those programs. As is argued at length below, Mr. Shvartsman will be serving a longer, more difficult sentence than a US citizen would serve in this case, and the Court should consider that when it imposes sentence on Gerald.

In addition, at the time he made his recommendation, the Probation Officer had before him only a few of the letters of support attached to this memorandum. As the Court can see, a great many more letters have been submitted in support of Mr. Shvartsman than were available to the Probation Officer. The Defendant respectfully submits that the additional information included in the letters regarding the damage a period of incarceration would do to his business, and the damage a jail sentence would do to his health and

to his family, all justify a sentence of less than that recommended by the Probation Department.

For all the reasons argued below, the Defendant respectfully submits that a sentence of 18 months of home confinement is appropriate here. Such a sentence would be "sufficient but not greater than necessary" to provide just punishment, while allowing the Defendant to maintain his business, keep his family intact, and begin treatments for his recently diagnosed Crohn's Disease. We urge the court to impose such a sentence. <u>See</u> 18 U.S.C. § 3553.

This matter is now ready to proceed to sentencing.

**B.** <u>**Mr. Shvartsman's Personal History, Family Circumstances and Character**</u>

Mr. Shvartsman's parents and paternal grandparents immigrated to Canada through the Hebrew Immigrant Aid Society (HIAS) at a time when anti-semitisim was at its peak in the Soviet Union. With nothing more than the clothes on their back, his family went first to Italy, and a year later they went to Toronto, where Mr. Shvartsman was born.

Mr. Shvartsman had a difficult childhood. His immigrant parents were so poor when Mr. Shvartsman was born, they used a drawer in their dresser as his crib. Even though Mr. Shvartsman's parents were well educated, with college degrees from the Soviet Union, they did menial labor to earn a scant

living after arriving in Canada, Mr. Shvartsman's father delivered pizzas, and his mother worked in a jewelry factory as a laborer. For years, the whole family worked at the Pickering flea market on the weekends, to earn extra money. In 1983, Mr. Shvartsman's parents opened a jewelry store, where they worked long hours to make ends meet.

The difficulties suffered by the Shvartsman family in Canada are well described in the letter written by Gerald Shvartsman's mother Klara, who writes

> I … worked as an accountant in Ukraine, but it was not a life I wanted for my children, and we … fled in 1975, ending up in Canada. … I went to work in a factory. I worked long hours, and it hurt my children to see me so tired. ….
> Gerald, my youngest, on his own went out at the age of 6 and piled papers onto his sled and delivered them for the neighbors. I remember the first time I saw him working I was so surprised as I had never asked him to do such a thing. He would bring me the $3.00 he made to try to help at home. Gerald is outgoing and friendly, and has a deep heart. He is emotional and he feels a great deal of guilt about how much worry he has caused me.

Letter of Klara Shvartsman, attached as Exhibit B.

Because they were always struggling to make ends meet, Mr. Shvartsman's parents could not spend as much time as they wanted with their children. Gerald's brother Michael became Gerald's primary caretaker early in Gerald's childhood, and Gerald remains remarkably close to his brother to this day. Id.  The Shvartsman family's financial stress pushed

Michael into the workforce at 17, and that left Mr. Shvartsman on his own as a young teenager, to fend for himself.

As Gerald got older, his father began making poor decisions and the family struggled even more financially, because of "his father's unsteady business ventures" and his parents' support of their own parents. PSR, p. 16. Eventually, his father's business misadventures forced Gerald's family to sell their home. Gerald's father left the family completely when Gerald was in 9th grade. At that point, Defendant's father lived abroad for five years, as he attempted, unsuccessfully, to establish a business in Ukraine. This left Mr. Shvartsman estranged from his father.  Id.

Mr. Shvartsman struggled in school, suffering from attention deficit disorder and hyperactivity, conditions that were relatively new diagnoses, for which there were limited treatments when Gerald was young.  Because of his learning disabilities, Mr. Shvartsman was enrolled in a "special education" program beginning in elementary school, and he continued on that track throughout his school days. PSR, p. 16, 18.  As a child, Mr. Shvartsman was picked on and was often subjected to name calling and bullying by his peers. When Mr. Shvartsman was 6, his mother insisted that he "man up," and beat him for not fighting back against his bullies. Ultimately, Gerald didn't complete high school, and left school in the twelfth grade. PSR, p. 19.

Despite the difficulties Mr. Shvartsman had in his youth, he has made a success of himself through grit and hard work. Gerald began working as a high school student, delivering newspapers and doing odd jobs. PSR, page 16. Despite his drive and hard work, the Defendant has had some ups and downs financially, experiencing two years of unemployment from 2005-07.

Eventually, Mr. Shvartsman found his way into the furniture business, after emigrating to the United States. When he first arrived in the United States, Gerald had nothing, and he slept on a mattress on the floor of a friend's apartment. Later, he slept on a mattress in the warehouse of the furniture business he formed in 2007 and operated for nearly 10 years. PSR, p. 20. Gerald's first furniture business failed after its ten-year run. But his most recent venture, Source Furniture, has continued to operate successfully since it began operations in 2017, even though it too has had some ups and downs. PSR, p. 19.

As the PSR demonstrates, Mr. Shvartsman is a "self-made" man, who pulled himself up by some pretty short bootstraps, given his difficulties as a child. He worked hard and learned every aspect of the furniture business while building Source Furniture, which is now a thriving company. And, while he is certainly sophisticated when it comes to the furniture business, nothing in Mr. Shvartsman's background indicates that he has any great

sophistication in securities trading or any extensive knowledge of the limits on and laws relating to trading in securities.

Mr. Shvartsman does not deny that he traded when he knew he shouldn't have – he accepts full responsibility for his crime here.  But his culpability for that crime – a single set of actions over a brief period of time, consisting of a foolish amalgamation of trades for his own accounts and blundering tips to a couple of his employees – are far less culpable than they would be if Mr. Shvartsman was a trained securities professional; or a person with real sophistication and training in securities transactions; or a person who tipped multiple persons who themselves traded improperly.

Many of the letters written by Mr. Shvartsman's friends emphasize his fundamental decency, and the tremendous efforts he has put in to build his furniture company.  These letters also note how much Mr. Shvartsman is devoted to his friends and family, to whom he is always ready to give a helping hand.  For example, Mr. Shvartsman's friend Gary Guzzo, who has known both Gerald and Michael Shvartsman for approximately 20 years,[2] describes how Gerald helped him in his own business, "generously offer[ing] me a portion of his office at no charge for several months, allowing me to test my concept without financial strain."  Mr. Guzzo also

---

[2]  Mr. Guzzo has also written a letter in connection with Micheal Shvartsman's sentencing.

describes how Gerald and Michael "stepped in and took care of all the expenses for my daughter's funeral" after she died in a car accident.  Letter of Gary Guzzo, attached as Exhibit C.

In a similar vein, Sarit Oren writes that she watched Mr. Shvartsman pull himself up by his bootstraps, "struggl[ing] and work[ing] harder than anyone I know" to make his furniture business a success, building "a company that hires hundreds of employees."   At the same time, the Defendant took Ms. Oren under his wing when she "got divorced and found [herself] in a new country with a young toddler," helping her and her daughter financially and emotionally at a difficult time.  As Ms. Oren recalls it, "[c]oming from divorced parents, he empathized deeply and I immediately saw how his heart extended so wide.  Gerald at his soul is a giver not a taker …. and his good acts abundantly outweigh[] his foolish mistake."  Letter of Sarit Oren, attached as Exhibit D.

For Mr. Shvartsman, charity is personal, and he is always ready to reach out to help a friend who is struggling.  His friend Frank Rivero, who has struggled with addiction, writes

> Gerald sat me down one day and did not end our business relationship but focused on me as a person.  He paid for me to go to treatment out of his own pocket, back when it was around $30,000. When I got out, he provided me with equipment and money to start my own business.  I have been sober now for 10 years.  I am not much better at

business, but I am clean and certainly make better
choices in life.

Letter of Frank Rivero, attached as Exhibit E.

Mr. Shvartsman's friend of more than 30 years, Darren Delaney, also notes that "Gerald is a dedicated, hard-working family man and he is a loyal friend who would not hesitate to help when needed."  Letter of Darren Delaney, attached as Exhibit F.  And Mr. Shvartsman's rabbi writes that he "has a deep love for those less fortunate," and describes how Mr. Shvartsman devotes himself to assisting "needy families … a noble and impactful act of kindness."  According to Rabbi Katz, "[Gerald]  is kind, caring and compassionate."  Letter of Rabbi Zev Katz, attached as Exhibit G.

The indictment and conviction in this case represent a tiny fraction of the Defendant's life and character.  Gerald Shvartsman is a great deal more than the bumbling trader and tipper who emerges from the facts of this case. He is a father and business owner and a significant member of his community.  And he is far more devoted to these roles than he is to venal crimes of the sort he stands convicted of in this case.

### C.    Mr. Shvartsman's Participation in the Offense

The events at issue in the indictment took place over a few months in the Summer and early Fall of 2021, and Mr. Shvartsman's actions in

connection with the crimes charged were intermittent and sporadic.  Mr.

Shvartsman was, by all accounts, not the "mastermind" of the criminal

activity charged against him, and he was not an "insider" at DWAC except

in the sense that he was bound by a Non-Disclosure Agreement ("NDA")

with respect to information he received from others.  And it is clear from the

facts of the case that Mr. Shvartsman did not control the information he

received and tipped to others – the indictment pleads that Mr. Shvartsman

was, sporadically, a tippee of his co-defendants, and that he tipped two of his

employees opportunistically, after he received "inside" information.  See

Indictment, pages 8-9 and 13-14. These facts do not absolve Mr.

Shvartsman, of course, but there is nothing in the indictment to suggest that

Mr. Shvartsman was a leader or organizer of an extended or sophisticated

insider trading ring.  Mr. Shvartsman was surely no Boesky or Rajaratnum.

Discovery produced by the government demonstrates as much.

Attached as Exhibit H is an email produced by the government to the

defendants.  In this June 28, 2021 email, the Defendant is listed as one of 8

prospective investors in DWAC.  He is not the organizer and principal leader

of the DWAC deal – Patrick Orlando played that role, assuring all that a

possible "Trump Deal" was on the near horizon.  Nor was the Defendant the

main conduit of information that traveled to investors from Mr. Orlando.

Instead, Mr. Shvartsman is simply one of many potential investors in the

deal, listed with others who ultimately decided to invest in DWAC along with him, based on information provided by Mr. Orlando and his colleagues with a nudge and a wink.

And a week and a half later, on July 8, the Defendant still had no idea whether he was "in or out" of the "trump deal" flogged by Mr. Orlando. Attached as Exhibit I is an email dated July 8, 2021, which the Defendant sent to his brother Michael and his co-defendant Bruce Garelick. In this email, the Defendant asks about the status of the "trump deal" proposed by Mr. Orlando, and asks "are we in or out where's the docs?" Exhibit I. The emails attached as Exhibits H and I are clear evidence of the Defendant's relationship to the DWAC deal. They demonstrate that the Defendant was simply a "go along, get along" type investor like many others, following the lead of other investors and getting his information from Mr. Orlando first or second hand. The Defendant was only an intermittent participant in the conspiracy and securities fraud schemes alleged in the Indictment.

The Defendant is not entitled to a "minor role" adjustment in his sentencing guidelines, and he does not seek one. Indeed, in his plea agreement, the Defendant stipulates that no downward or upward role adjustment is merited in this case. The Defendant stands by his agreement. However, the Sentencing Commission recently amended the Commentary to Sentencing Guidelines Section 3B1.2, listing five factors a District Court

should consider when determining whether to apply an adjustment based on the defendant's role in the offense he stands convicted of. In this case, the Defendant submits that the Court should consider these factors by analogy, because they provide a good means to weigh his culpability, even where no downward adjustment is applied. The five factors listed in the Commentary to Section 3B1.1 are:

1)    The degree to which the defendant understood the scope and structure of the criminal activity.

2)    The degree to which the defendant participated in planning or organizing the criminal activity;

3)    The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

4)    The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

5)    The degree to which the defendant stood to benefit from the criminal activity.

United States Sentencing Guidelines Section 3B1.2 Comment 3(C). Each of these factors suggests that Mr. Shvartsman's culpability is mitigated and modest in this case, given his position.

The indictment and the emails attached to this memorandum make clear that Defendant Shvartsman was not aware of the full scope or structure of the criminal activity that is charged in the Indictment, and the attached emails certainly demonstrate that he did not participate in any planning or management of the crimes charged in the Indictment. To the contrary, the facts support an inference that Mr. Shvartsman traded and tipped opportunistically, when he was given "inside information" by others. And although the Defendant's involvement in the DWAC insider trading scheme lasted for several months, his participation in the scheme was sporadic and occasional, rather than extensive, consistent or considered. And while the Defendant certainly benefitted from his crime, his profit on his illicit trades was dwarfed by the profit of other participants in the scheme.

In short, the Defendant is clearly guilty of insider trading, and he is not a minor participant in the scheme charged, but the facts relating to his participation in the events described in the Indictment suggest that some degree of mercy can be extended to him at sentencing, because he was neither an organizer or manager of the illicit trading described in the Indictment.

### D.    Mr. Shvartsman's Family Circumstances

The Defendant is married, with two small children.  His business is the only source of income for his family, and he plays an active role in raising his children, both of whom are very close to him. Gerald spends a lot of time with his children because his own parents were not able to spend much time with him as a child.

Those who know Mr. Shvartsman well have remarked on his close relationship with his children in their letters.  Gary Guzzo describes Mr. Shvartsman as "an exceptionally wonderful, loving, caring and nurturing father to his children Ayden (six), Jason (three), and to his nephews and niece," and he worries that a jail sentence "would not only punish Gerald but would have the most significant effect and punishment on his children, nephews and niece."  See Exhibit C.  In a similar vein, Sarit Oren writes "Gerald is a husband to two very very young children and the detrimental effects of boys without their father is heartbreaking and sad for them who are fully innocent."  See Exhibit D.  And Elie Oren writes that he can't "see how[] his 2 boys and wife will live their day to day with out him."  Letter of Elie Oren, attached as Exhibit J.  And Candice McCarthy notes that the defendant is "amazing father" to his children.  Letter of Candice McCarthy, attached as Exhibit K.

The Defendant's wife, Zita Zimmerman, describes Mr. Shvartsman as "the provider and pillar of support ad strength" of their family, and notes how deeply involved Gerald is in the raising of his two boys – "he has done everything from night shifts, changing diapers, bottle feedings to now helping with homework, showing up at activities, driving to school and even doing morning and/or night routines. There is not a single thing he doesn't do … for his kids." Letter of Zita Zimmerman, attached as Exhibit L. Ms. Zimmerman explains Gerald's zest for parenthood by noting that he

> did not have his father present most of his life therefore we both recognize the importance of a male role [model]. The absence of a father can have a detrimental impact on a child and I fear this for my boys. They need the stability and strength that my husband provides them with.

Id. As Ms. Zimmerman puts it, "How would I even begin to explain to a 3 and 6 year old that their father is now gone? Life for them will forever change and not be as they know it to be, a happy, healthy family unit, now broken and distressed." Id.

The Defendant also cares for his elderly mother. He and Michael are his mother's primary caretakers. Gerald takes his mother to her doctor visits, and when she has needed surgery in the past, he acts as a nurse, making sure she is cared for. As Klara Shvartsman puts it in the letter attached as Exhibit B, "My life would be very difficult without [Gerald and Michael], it would be impossible for me to live. I do not have anyone; they

have all died.  My sons are my only living relatives and they are my lifeline.

They provide food, a home and care for me personally.  Exhibit B.

      The defendant's close relationship with his family, his role in raising

his children, and the harm a lengthy term of incarceration would impose on

the defendant's mother, wife and children all weigh in favor of a reduced

sentence in this case.

### E. <u>Mr. Shvartsman's Business, and the Impact of a Sentence on It</u>

      As the PSR notes, Mr. Shvartsman is the founder and chief executive

officer of a "wholesale outdoor furniture and patio [furniture] manufacturing

company" named Source Furniture, LLC.  PSR, page 19.  The Defendant

works hard at Source Furniture and is a key employee of the company.  He

supervises and participates in every aspect of the company.  Gerald designs

much of the furniture he sells, and after designing the furniture, he helps

manufacture it, he sells it, and he helps figure out manufacturing and

shipping logistics while managing the company's finances.[3]

      During the past five to six years, Mr. Shvartsman's furniture company

has evolved significantly.  During the early years of its existence, Mr.

Shvartsman's company was importing most of the furniture it sold.  Now,

Source Furniture's imports are down, and it is manufacturing much of its

---

[3] The graphs attached together as Exhibit M show that Mr. Shvartsman is responsible for more than 20% of Source Furniture's sales during the last two years.

inventory in house.  As a result, Gerald's company has had to acquire a great deal of machinery to manufacture the furniture it sells, and the company's work force has expanded significantly to give it the manpower it needs to build furniture.  Copies of equipment leases, showing Source Furniture's acquisition of manufacturing equipment to produce furniture "in house" are attached as Exhibit N.  Mr. Shvartsman has managed every aspect of Source Furniture's growth as he grew his business from a furniture sales enterprise to a manufacturing plant where the majority of his products are made in-house.

Mr. Shvartsman is not just a key employee at Source Furniture, in many respects he *is* Source Furniture, and if a lengthy prison sentence is imposed on him, there is a very real chance that Source Furniture will fail and the 150+ employees and independent contractors who work there will be put out of work.  Mr. Shvartsman is a personal guarantor on the equipment leases Source Furniture took to acquire the equipment it needs to manufacture furniture in house.  See Exhibit N.  The Forfeiture Judgment in this case will result in a default on Source Furniture's equipment leases, but the lessor has agreed not to repossess Source Furniture's manufacturing equipment, if it can continue to make the lease payments that are required.

Moreover, Gerald is personally responsible for a huge chunk of Source Furniture's sales.  See Exhibit M.  If Gerald goes to jail for an

extended period, it is likely that Source Furniture's sales would drop precipitously, leaving it unable to pay the leases it took to expand and manufacture furniture in house. At that point, the lessor would repossess Source Furniture's manufacturing equipment, and the result would be to shut the company down and force its liquidation.

Gerald recently hired Steven Bramson, a veteran furniture executive to be the CEO for Source Furniture, to help the company weather the storm caused by this case. And the negative impact of this case on Source Furniture has been a financial hurricane. The negative publicity surrounding this case has driven Source Furniture's sales down, and caused some customers to cancel their orders; all but one of Mr. Shvartsman's credit cards – which he often uses in connection with his business – have been cancelled; and Mr. Shvartsman's and Source Furniture's banking relationships have been damaged and their accounts have been closed. Mr. Shvartsman is working diligently to get Mr. Bramson up to speed, but the damage done by this case to Source Furniture is very significant, particularly because Mr. Shvartsman is so deeply enmeshed in every aspect of Source Furniture's operations.

Mr. Bramson, the new CEO observes, "Gerald is involved in every aspect of the business – both tactically and strategically. He is not only a leader but a guiding force for his team, providing direction and support in

ways I haven't seen at other companies."  Letter of Steven Bramson, attached as Exhibit O.  Indeed, Mr. Bramson believes that Gerald's "deep involvement in Source Furniture is critical to the company's ongoing success," and that "there's no question that Source needs Gerald's leadership to continue flourishing."  Id.  And he worries that "without Gerald, I … have serious concerns about our ability to thrive and support the almost 175 employees we have at our company and sustain their livelihoods.  This case has created difficulties with banking, equipment and other relationships that require Gerald's presence to move through.  His unique insight, dedication, hand on approach, and vision are integral to ensuring Source Furniture survives."  Id.

Similar views are stated by Herman Keesee, PE, based on his observation of Gerald and his co-workers when Mr. Keesee helped to update Source Furniture's manufacturing practices and the layout of the company at a new facility.  See Letter of Herman Keesee, attached as Exhibit P.  After noting that he "[was onsite at Source Furniture] and the new location for over 60 days and saw Mr. Shvartsman's daily interactions with office and factory personnel," Mr. Keesee opines that "Source Furniture would suffer grave consequences without Mr. Shvartsman's daily guidance" because he "provides oversight daily" for Source's "one hundred plus employees."  Without Mr. Shvartsman's presence at Source Furniture, Mr. Keesee worries that Source may suffer "a staff reduction, and or

cease to exist as a successful entity." Id.

The law has long recognized that the threat to innocent employees posed by the potential incarceration of a key manager can justify a sentence below the applicable guidelines range. See United States v. Milikowsky, 64 F.3d 4, 8 (2d Cir. 1995); United States v. Somerstein, 20 F. Supp. 2d 454, 460-62 (EDNY 1998). The Defendant respectfully submits that the Court should consider these facts when it weighs "the history and characteristics of the defendant" in connection with the sentencing in this case, as is required by 18 U.S.C. Section 3553(a).

Many of Source Furniture's employees have written the Court to describe their experience working with Mr. Shvartsman, and those letters reveal much that the Court should consider as it measures Mr. Shvartsman's character. Many of the employees at Source Furniture are convicted felons, who went to work with Mr. Shvartsman when on work release, and who stayed with Source Furniture to build productive careers after leaving prison. Mr. Shvartsman is devoted to his employees, and his "business model emphasizes second chances" and giving his employees opportunities to grow. Letter of Linnette Grubbs, attached as Exhibit Q. As Ms. Grubbs puts it, "Gerald is not just an employer; he is a pillar of our community. … [His] commitment to helping others speaks volumes about his character and values." Id.

Source Furniture employee Patrick Survilas describes just how impactful Mr. Shvartsman's help can be:

> I was sentenced to 30 years and released … after serving 14 years…. I was at a crossroads when Gerald offered me the opportunity to work at Source Furniture. I was eager to leave my past behind and rebuild my future based on integrity and hard work. But after multiple tries with interview after interview, I was told that due to my criminal record, they could not hire me. Gerald's willingness to look beyond my criminal history and see my potential meant more to me than words can express.

Letter of Patrick Botuchis Survilas, attached as Exhibit R.

And Angel Sierra, who has now worked for Mr. Shvartsman and Source Furniture for 14 years, describes how he was given a chance to rise through the company, and better himself:

> I started in Packing, then Logistics and now am the Production Manager. Truth is, many of the people who have walked these floors have been in less than desirable situations, and Gerald has never hesitated to help. I am eternally grateful to have landed here. In having done so, the opportunity allowed me to provide for my mother, daughter and my grandmother in her late days. Something I could never have imagined otherwise.

Letter of Angel Sierra, attached as Exhibit S.

Mr. Shvartsman's supervision and nurturing of his employees is a difficult job, but he excels at it, applying tough love when necessary.

According to his employee Chris Hogan,

> Gerald is intense and challenged me in ways which I needed to be challenged. At that time in my life [as a felon with a drinking problem], there was not many people I would allow to push me the way he did. A job is only as good as the people you work with. Gerald has created an environment that does not force us to hide or be prejudiced by our pasts. He

is still hard on me, but I could not be happier than where I am right now in life or how he runs his business, without him it cannot be the same.

Letter of Chris Hogan, attached as Exhibit T.

       The letter written by Alexander Manressa is particularly compelling.  Mr. Manressa explains,

    …In 2008 [Gerald] gave me a chance, I did not realize the opportunity and was rearrested in 2018 after I had left the company.  I again went to prison and was released in 2022 and he stood by me.  He trained me, he supported me but was tough on me at the same time.  He made me feel like he cared, and I wanted to show him how grateful I was after an endless string of jobs.  I started out at this company as a delivery driver and now I am a Logistics Manager, and my past is my past.  I am happy, I am in a good relationship, and I am clean.
     I have watched so many walk in the door just like me and each one of us has been treated the same.  Most, not all saw there was a better way, but it is not easy the streets call you.  I say these things not to say he is some great humanitarian but to say this is a man who cares about us as a family, and he is a good man.  A good man that made bad choices and I hope you can show him the same second chance he gave me.

Letter of Alexander Manressa, attached as Exhibit U.[4]

       Through Source Furniture, Mr. Shvartsman has helped rehabilitate dozens of individuals who might never have found their way without him.  He has taken society's cast offs and most difficult projects, and through hard work, patience, kindness and toughness, helped them succeed.  In doing so, he has provided his community with a very real and substantial benefit.  Mr. Shvartsman's hard work to lift up others cannot be discounted, because it is

---

[4] Other letters of support from Mr. Shvartsman's employees, all of whom are grateful for Mr. Shvartsman's mentoring of them at Source Furniture, are attached together as Exhibit V.

a clear window into his character, which the Court must measure in the sentencing process.  Mr. Shvartsman respectfully submits that the attached letters from his employees at Source Furniture show both how critical he is to Source Furniture's operations, and how little justification there is to impose a jail sentence on him.

### F.    Mr. Shvartsman's Health

The Defendant does have significant health issues, which the Court should consider when it imposes sentence.  The Defendant has had a serious back injury that required surgery.  His back injury continues to require regular Chiropractic treatment to help control his back pain, and the Defendant is considering additional back surgery to help deal with his injury.  PSR, p. 18.

The Defendant has twice had melanomas removed surgically.  He requires regular skin scans to detect any return of his skin cancer.  And the Defendant suffers from an acute and severe form of psoriasis, which requires medication and a special light therapy device.  Id.

Very recently, the Defendant was diagnosed with Crohn's disease.  See Letter of Dr. Michael Bloom, attached as Exhibit W.  Dr. Bloom has prescribed a biologic immunosuppression therapy to treat Mr. Shvartsman's Crohn's disease, and that treatment requires close monitoring and regular treatments.  Id.  In addition, the treatment will leave Mr. Shvartsman with "a

higher chance of developing infections, particularly tuberculosis."  See NIH Description of Treatment for Crohn's Disease, attached as Exhibit X.  For this reason, Dr. Bloom recommends that Gerald "stay out of a prison environment," where infection by tuberculosis and other diseases is a very significant risk.  See Exhibit W.

The Defendant acknowledges that the Bureau of Prisons has medical staff that can provide treatment to him for the variety of conditions he suffers from.  But there can't be any doubt that the treatment the defendant will receive while incarcerated is not as effective as the treatment he is currently receiving.  See NPR, "Law Makers Push for Federal Prison Oversight After Reports of Inadequate Medical Care," attached as Exhibit Y. The Defendant's various medical conditions require constant monitoring and treatment, and his treatment for Crohn's disease will result in serious immunosuppression, leaving him at serious risk if he is housed with other prisoners in an unsanitary environment.  The Bureau of Prisons is simply not that well equipped to provide safely the type of monitoring and calibrated treatment the Defendant needs.  This is another reason why the Court should consider reducing the term of incarceration to be imposed on the Defendant or substituting home confinement for incarceration in this case.

### G. Mr. Shvartsman's Immigration Status

Mr. Shvartsman is a Canadian citizen who has lived a law-abiding life in the United States for almost 20 years, and he has had a green card for almost five years at this point.  PSR, p. 16.   As a non-citizen, a sentence of imprisonment will have a more severe impact on Gerald than other similarly situated defendants in at least three ways. First, if Gerald is sentenced to a term of imprisonment, he will be ineligible to serve his time in a minimum security, federal prison camp.   The Bureau of Prisons' (BOP) policy requires that "[a] male or female inmate who is not a citizen of the United States . . . shall be housed in at least a Low security level institution." BOP Program Statement 5100.08, Chapter 5, page 9.   Even though Gerald has lived in the United States peacefully for almost 20 years and is a first-time, non-violent offender, this policy precludes Gerald from serving any portion of his sentence in a minimum-security camp where similarly situated defendants would typically be placed.

Courts have reacted to the BOP's policy by drastically reducing sentences for foreign nationals in white collar cases, in order to account for the disparate treatment foreign nationals receive in our prison system.  For example, a district court in the Northern District of Illinois recently sentenced a defendant with foreign citizenship to time served and 3 years in community

confinement (i.e., a BOP half-way house), despite the government's demand

for a 10-year sentence, describing the BOP's policy with respect to the

imprisonment of foreign nationals as "ridiculous".[5]   See Judgment in a

Criminal Case at 1, United States v. Agarwal, No. 19-cr-864 (N.D. Ill. July 1,

2024) (ECF No. 807).

     Judge McMahon of this District has also recognized the disparate

impact of the BOP's policy on non-citizens. In United States v. Black, the

defendant was charged and convicted at trial of conspiracy to commit wire

fraud and bank fraud and substantive wire fraud.  In sentencing the

defendant, Judge McMahon calculated a Guidelines sentence of 57 to 71

months' imprisonment. See Transcript of Sentencing Hearing at 56:4-15,

United States v. Black, No. 16-cr-370 (S.D.N.Y. Oct. 24, 2019) (ECF No.

451) (Excerpts attached as Ex. Z). However, Judge McMahon also

considered the impact of BOP's policy for non-citizens on the defendant and

explained: "If I could sentence Mr. Black to a term of incarceration—a brief

term of incarceration—knowing that he would go to a facility appropriate to

his criminal conduct, I would do it. But I know that I can't. I know that

simply because he is a non-citizen—and I use that term advisedly. He is not

an illegal alien. But because he is a non-citizen, he will not be eligible to

---

6. Laura Ann Wood, Judge Blasts Prisons Bureau, Sends Exec to Halfway House, Law 360 (June 27, 2024, 10:14 PM ET), https://www.law360.com/articles/1852226/judge-blasts-prisons-bureau-sends-exec-to-halfway-house (reporting on sentencing hearing in United States v. Agarwal).

serve his sentence in the same way that any American citizen who stood

convicted of this crime would serve. And that's not right. Id. at 91:4-12.

Judge McMahon imposed a non-custodial sentence of time served, with 9

months' home confinement and 3 years of supervision. Id. at 95:6-9.

Gerald is also a non-citizen, and he has lived a law-abiding life in the

United States for almost 20 years.  If he is sentenced to a term of

imprisonment, he will be required by the BOP to serve that sentence in, at

best, a low-security facility.  Gerald should not be required to serve a term of

incarceration that would result in a harsher sentence for him than the sentence

a native-born citizen would typically receive, by serving his or her sentence

in a minimum security, camp facility.  The Court should take this

unwarranted additional punishment on Gerald into consideration under

Section 3553(a) – just as Judge McMahon did -- and sentence Gerald to

home confinement, which is a close comparable to serving a sentence in a

federal prison camp.

Moreover, Gerald's status as a non-citizen means that, after Gerald

serves any term of imprisonment, U.S. Immigration and Customs

Enforcement (ICE) will lodge a detainer and place Gerald in immigration

detention pending deportation proceedings. See 8 U.S.C. § 1182(a)(2)

(requiring post-sentence immigration detention for any non-citizen convicted

of fraud upon release from BOP custody). In 2023—the most recent year for

which statistics are publicly available—the average length of stay in an ICE

detention center for a convicted noncitizen was 37.5 days (approximately 5

weeks). See Dep't Homeland Sec., U.S. Immigration & Customs Enf.,

Strategic Context (Fiscal Year 2023) at ICE-3 (Excerpts attached as Ex. AA),

p. 18.  This period of detention will extend any term of imprisonment

imposed on Gerald by at least an additional month. See United States v.

Rodriguez, 2022 WL 158685, at *5 (S.D.N.Y. Jan. 18, 2022) (Oetken, J.)

(referring to the defendant's deportation as a "form of punishment itself" and

noting that the defendant's time in an immigration detention center prior to

deportation "will also add time to his term of incarceration" (citing United

States v. Chin Chong, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014)).

To make matters more punitive, conditions at ICE detention facilities are

notoriously poor.[6]  The fact that any term of imprisonment would be extended

by detention of uncertain duration in a sub-standard ICE detention facility

further supports the Defendant's argument that a non-custodial sentence is

appropriate in this case.

---

[6] See Brianne Hansen, Living Conditions in U.S. Immigration Detention Center, Ballard Brief (Spring 2019), https://ballardbrief.byu.edu/issue-briefs/living-conditions-in-us-immigration-detention-centers; Tom Dreisbach, Government's Own Experts Found 'Barbaric' and 'Negligent' Conditions in ICE Detention, NPR (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions; Beyond Repair: ICE's Abusive Detention Inspection and Oversight System, Nat'l Immigrant Justice Ctr. (Nov. 2023), https://immigrantjustice.org/sites/default/files/content type/research-item/documents/2023-11/NIJC-Policy-brief_ICE-detention-inspections_November2023.pdf.

Finally, a sentence of imprisonment—especially a sentence of more than a year—will be a strong negative factor in Gerald's deportation proceedings. See 8 U.S.C. § 1227(a)(2) ("any alien who . . . is convicted of a crime for which a sentence of one year or longer may be imposed, is deportable").  Deportation would be an especially harsh punishment for Gerald, who has been a hardworking and successful member of his community in the United States for many years. See United States v. Thavaraja, 740 F.3d 253, 262-63 (2d Cir. 2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, a district court may take into account the uncertainties presented by the prospect of removal proceedings."); United States v. Chin Chong, 2014 WL 4773978, at *6 ("Deportation is experienced as, and [is] popularly understood to be, a form of punishment. The law does not contend otherwise.").

In fact, if he is incarcerated and then detained and deported, Gerald may lose his business, which will suffer without his input and management. Gerald is attempting to find ways to help his business survive – hiring additional management personnel like Steven Bramson, for example – to prepare for the day when Gerald himself will have to help manage Source Furniture from Canada after his deportation.

Source Furniture has always been located in Florida, and it is hard to see how Source Furniture's operations could be transferred to Canada – patio furniture is a natural in Florida, but is far less so in the frigid North of Toronto.  Given Gerald's key role in the business, Source Furniture may not survive if Gerald is incarcerated and is unable to help install and train a new management team before he is deported.  Gerald hopes to help manage Source Furniture from 2000 miles away after being deported.  But he will need the time here in Florida to train additional managers before being deported to give Source Furniture and its employees their best shot at managing the trauma of Gerald's conviction.

Even worse, if he is deported, Gerald might lose the ability to live with his family in the only country his sons have ever known (his sons are native-born citizens).  If Gerald is deported, his family will be forced to make the difficult decision whether to split up so that Gerald's wife and children can continue living in the United States with all of the opportunities it affords, or moving to Canada together, and starting life over there. Such a punishment is excessive given Gerald's demonstrated good character and the circumstances of the offense in this case.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD IMPOSE
A SENTENCE THAT DOES NOT INCLUDE
IMPRISONMENT AS AN ELEMENT**

The Courts often note that the Sentencing Guidelines' focus on "loss" is misplaced, because the amount of the "loss" for Sentencing Guidelines purposes is often "a kind of accident" and thus "a relatively weak indicator of [] moral seriousness … or the need for deterrence." United States v. Emmenegger, 329 F.Supp.2d 416 (S.D.N.Y. 2004); and see United States v. Lenagh, 2009 WL 296999, *3-4, 6 (D. Neb. Feb. 6, 2009). Moreover, because the modification of the Sentencing Guidelines is a political process, amendment of the applicable guidelines in this case has been a "one-way upward ratchet increasingly divorced from considerations of sound public policy and even from commonsense judgments of frontline sentencing professionals who apply the rules." Bowman, *The failure of the Federal Sentencing Guidelines: A Structural Analysis,* 105 Columbia Law Review 1315, 1319-20 (2005). In fact, the sentences recommended by the Sentencing Guidelines for economic crimes have increased by more than 700% since the Guidelines debuted in 1987. With the enactment of Sentencing Guidelines Section 4C1.1 and the amendments to Section 5C1.1

34

that became effective on November 1, 2023, a little bit of sanity has,

hopefully, been restored to the Sentencing Guidelines.

The applicable Sentencing Guideline Section in this case is 18 U.S.C.

Section 2B1.4 (Insider Trading).  That guideline cross-references the loss

table in 18 U.S.C. Section 2B1.1, and ratchets up the defendant's sentencing

range based on the amount of gain he and his tippees received from their

trading, because, as the background note to Section 2B1.4 recognizes, "the

victims [of insider trading] and their losses are difficult if not impossible to

identify."

Some Courts have noted that "the Sentencing Guidelines for white-

collar crimes [can produce] a black stain on common sense."  United States

v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008).  At least one judge has

lamented "the utter travesty of justice that sometimes results from the

guidelines fetish with absolute arithmetic, as well as the harm that guideline

calculations can visit on human beings if not cabined by common sense."

United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006)

(Rakoff, J.).  For this reason, it is frequently the case that the Courts

throughout the Federal Judicial system impose sentences substantially below

the sentencing range dictated by a strict guidelines analysis of "loss" as that

term is defined in Section 2B1.1 of the Sentencing Guidelines.  See United

States Sentencing Commission, Quick Facts relating to Securities and

Investment Fraud Offenses 2022,[7] at p. 2, showing that almost 50% of the securities fraud offenders sentenced during 2022 received a downward variance from the otherwise applicable sentencing range, and that their average sentence reduction was almost 50% of the sentence recommended by the Sentencing Guidelines, attached as Exhibit BB. The Defendant submits that a similar skepticism about the use of mere numbers to calculate his culpability should be applied to this case, and to Guidelines Section 2B1.4, which explicitly incorporates by reference the loss table set out in Section 2B1.1.[8]

The Court should not accept the fetishization of "Loss" or "Gain" as a measure of culpability in the white-collar guidelines applicable to the Defendant. The problems inherent in accepting the trading "gains" of Mr. Shvartsman and his tippees as a fair measure of Mr. Shvartsman's culpability are clear: 1) the Defendant had no idea and could not control the trading of his tippees, and punishing him for the amount of their trades is not entirely fair to him, given that lack of control; 2) the persons who sold their

---

[7]  This is the most recent version of the USSC's Quick Facts that is available.

[8]  The Defendant submits that the Application Note for the Application of Subsection (b)(2) of Section 2B1.4 is really a better guide to measuring the Defendant's culpability than simply totaling up the gains from the trades at issue. As the Court can see, the factors in this Application Note focus on a diverse set of issues such as the number of transactions, the efforts to conceal the offense, and the duration and number of participants in the offense, all of which go to the extensiveness and sophistication of the scheme. Here, there was little sophistication, and the scheme was not extensive (it related to a single stock and the illicit trading was limited to a few trades during a few weeks). The Defendant submits that a consideration of these factors weighs in favor of a much more modest sentence than the applicable Sentencing Guidelines would suggest.

securities to and bought their securities from the Defendant and his tippees in the open market all received a price they regarded as fair and acceptable, and so, while the Defendant's conduct was immoral and illegal, to describe the harm done by the Defendant as the total amounts of the trades at issue overstates the harm caused by the Defendant's illegal conduct and his moral culpability – after all, those who traded with the Defendant did not lose their life savings, or even a substantial part of the value of their shares, as they would in a Ponzi Scheme or many other more devastating types of fraud where "loss" is used to measure culpability; and 3) the fallout from the Defendant's crime has been devastating to him – he will, inter alia, have a forfeiture judgment of millions of dollars hanging over him, and he will suffer all the collateral consequences of a felony conviction, including deportation.

The Sentencing Guidelines are intended to reflect the views of the public. But they do not. When asked what an appropriate sentence would be in a mail fraud case with a Sentencing Guidelines Range of 37-46 months incarceration, the average juror expresses the opinion that 7 months is adequate. Judge James Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?* 4 Harvard Law & Policy Review 173 (2010). That is why scholars studying the Sentencing Guidelines and federal sentencing practice observe that "the judiciary sees a

consistent disjunction between the sentences prescribed in the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives."  Bowman, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. Reporter 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

Over the past several years, Federal Courts have begun to look for measures of culpability that are different from the Sentencing Guidelines, because the Guidelines frequently appear to call for sentences that are perceived as excessive.  In looking for alternatives to the Federal Sentencing Guidelines, the Courts have often looked to the sentencing guidelines contained in the Report of the American Bar Association's Task Force on the Reform of Federal Sentencing for Economic Crimes (the "ABA Guidelines").  And, in many cases, Courts have adopted the measures of culpability recommended by the ABA Guidelines, after comparing the ABA Guidelines to the Federal Sentencing Guidelines.  See Anello and Albert, "Rise of the ABA Task Force's 'Shadow Sentencing Guidelines,'" New York Law Journal, Volume 255, No. 64 (2016) attached as Exhibit CC.

In this case, we urge the Court to consider the ABA Guidelines when it decides the sentence it will impose on Mr. Shvartsman.  To aid the Court, a copy of the ABA Guidelines is attached as Exhibit DD.

We respectfully submit that the ABA Guidelines suggest that a downward variance in Mr. Shvartsman's Federal Sentencing Guidelines sentencing range is appropriate, because the ABA Guidelines counsel that "a sentence other than imprisonment is generally appropriate" in a non-violent, first offense like this one.  See Exhibit DD, p. 2 (subsection (d)).  We respectfully submit that the ABA Guidelines' recommendation of a sentence that does not include incarceration is a good one in this case, and we urge the Court to impose such a sentence after calculating the Sentencing Guidelines and considering the other facts and issues raised by Mr. Shvartsman.

Congress's enactment of Sentencing Guidelines Sections 4C1.1 and amendments to Section 5C1.1 are its attempt to bring the application of the white-collar guidelines into better alignment with alternative measures like the ABA Guidelines, with the views expressed by the public in general, and with sanity.  The amendments to Section 5C1.1 are particularly significant in cases like this one, because the newly revised commentary to Section 5C1.1 gives the Court explicit permission to impose a sentence that does not include a sentence of incarceration in a case like this one.  Section 10(B) of

the Commentary to Section 5C1.1 of Guidelines provides:

10. Zero-Point Offenders.

... (B) Departure for Cases Where the Applicable Guideline Range Overstates the Gravity of the Offense.

A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j).

The Defendant is prohibited by his plea agreement from seeking a departure in this case, and he does not seek one. However, the language of the Commentary to Section 5C1.1 makes absolutely clear that the Court may consider a sentence that does not include incarceration where the defendant is a first offender; where the applicable guidelines range overstates the gravity of the offence; and where the offense is a non-violent offense that is not an otherwise serious offense listed in 18 U.S.C. Section 994(j). The Defendant respectfully submits that the applicable guidelines overstate the gravity of his offense through the bloated Loss Table in Section 2B1.1. Because he is a first offender and the Defendant's conviction is for a non-violent offense that is not "otherwise serious" by the standards of Section 994(j), the Court can and should consider a sentence that does not include incarceration as an element. See Section 5C1.1. In fact, such a sentence would be entirely just in this case.

## POINT II

## THE RELEVANT FACTORS DESCRIBED IN
## TITLE 18 U.S.C. SECTION 3553(a)(2)
## ALSO WEIGH IN FAVOR OF
## A NON-GUIDELINES SENTENCE
## THAT DOES NOT INCLUDE INCARCERATION

Title 18 U.S.C. § 3553 provides that the Court should impose "a sentence sufficient but not greater than necessary" to provide just punishment for the defendant, and it requires the Court to consider "the nature and circumstances of the offense and history and characteristics of the defendant."   Pursuant to 18 U.S.C. § 3553, the Court must also consider the need for the sentence it imposes "to reflect the seriousness of the offense, [and] to promote respect for the law."  18 U.S.C. § 3553(a)(1) and (2)(A). These sections of the Code direct the Court to consider the defendant and his actions holistically, and to "provide just punishment for the offense" in light of all the facts known to the Court.

In the present case, we respectfully submit that, after a measured and thoughtful consideration of all the relevant facts, the Court should sentence Mr. Shvartsman to a term of home confinement for eighteen months, followed by a three-year term of supervised release, while ordering him to pay a forfeiture of $4.6 million.  We submit that this sentence is certainly severe enough to "to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

There is no question that a substantial sentence of home detention is a serious one. Compare Gall v. United States, 128 S. Ct. 586, 595-96 (2007) (a probationary sentence imposes a significant restraint on the liberty of a defendant). In fact, no one could characterize the sentence proposed here as a "slap on the wrist," given all the relevant circumstances.

A sentence of this kind will allow Mr. Shvartsman to continue to manage his business, to fully monitor and treat his health conditions, and to support his family financially and emotionally, while seriously restricting his liberty before he faces deportation. That is precisely the sort of sentence that 18 U.S.C. § 3553(a)(1) encourages the Court to impose. Moreover, as noted above, a sentence of home confinement will be comparable to the sort of sentence – in a federal prison camp – a United States citizen would serve.

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This factor focuses on general deterrence of the public from committing criminal conduct of the type the defendant has engaged in.

With respect to general deterrence, Mr. Shvartsman submits that a substantial sentence of home detention, together with the stringent financial penalty required by his plea agreement, will provide good *general* deterrence

to future criminal conduct of others, as required by Section 3553(a)(2)(B), to the extent such deterrence can be effective.  If the Court imposes the sentence Mr. Shvartsman suggests, Mr. Shvartsman will be a convicted felon who has already suffered significant public obloquy; he will serve a significant term of home detention; and he will have lost a significant amount of money as a result of getting involved in the insider trading scheme described in the indictment.  No one hearing of Mr. Shvartsman's sentence could fairly describe it as inappropriately "soft on crime," or an invitation to commit a similar crime.

In this regard, the Court should be aware that the effectiveness of harsh sentences as "general deterrents" is questionable.  Social science appears to undermine the notion that lengthy sentences of incarceration will deter others from committing similar crimes.  Social scientists have noted that "potential criminals . . . do not believe [that] they will be apprehended and convicted," and therefore they do not "consider sentence consequences in the matter one might expect of rational decision makers." Amy Baron-Evans, Sentencing by the Statute, 7-9 (Apr. 27, 2009, revised Dec. 21, 2010), http://www.fd.org/docs/select-topics/sentencing-resources/sentencing-by-the-statute.pdf?sfvrsn=4 (citing Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006)).  "[R]esearch on the personality of known offenders

portrays them as impulsive, impatient, easily distracted, narrowly focused on the short-term consequences of their actions and biased towards behaviors that are immediately gratifying, regardless of the long-term risks." Gary Kleck et al., <u>The Missing Link in General Deterrence Research</u>, 43 CRIMINOLOGY 637 (2005).

Empirical evidence demonstrates that actual punishment levels, measured in terms of certainty, severity, and celerity, have no effect on perceived punishment levels on the part of criminals and non-criminals alike. <u>Id.</u>, at 644, 647, 650.  Although the "punishment-generating activities of the criminal justice system" may produce some "baseline deterrence effect," there is no indication that deterrence is influenced by either an increase or a decrease in punishment levels. <u>Id.</u>, at 653; <u>see also</u> Raymond Paternoster, <u>How Much Do We Really Know About Criminal Deterrence?</u> 100 J. CRIM. L. & CRIMINOLOGY 765, 804-05, (2010); <u>and see</u> Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (no difference in deterrent effect of probation as opposed to incarceration).  Because there is no evidence to suggest that sentencing Mr. Shvartsman to a more severe punishment will lead to a reduction of crime through general deterrence mechanisms, and there *is* evidence to suggest that no deterrent effects will be lost if Mr. Shvartsman is sentenced to a term of home confinement, consideration of 18

U.S.C. § 3553(a)(2)(B) weighs against imposing a term of imprisonment. See Kleck at 655. For these reasons as well, we respectfully submit that a term of incarceration is not necessary to promote general deterrence of the sort contemplated by 18 U.S.C. § 3553(a)(2). In this case, an 18-month term of home confinement can be just as effective in providing any general deterrence to future conduct of the sort at issue in this case as a jail sentence would be.

The third factor listed in 18 U.S.C. § 3553 (a)(2)(C) focuses on specific deterrence of further criminal conduct by the defendant himself. It requires to the Court to consider the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(C). If the Court imposes an 18-month term of home confinement on Mr. Shvartsman, followed by a three-year term of supervised release, such a sentence will certainly provide good *specific* deterrence to prevent Mr. Shvartsman from committing any further crimes, because he will be monitored by a probation officer for an extended period (nearly 5 years), and he will therefore have little opportunity to engage in further criminality.

The specific deterrence that has resulted from the investigation and prosecution of this matter includes significant collateral consequences that will be suffered by Mr. Shvartsman, including public obloquy and disgrace, an enormous financial obligation, the likely loss of his immigration status,

and the entry of a Judgment against Mr. Shvartsman by the SEC barring him from further wrongful activity. All these collateral consequences of his conviction here will make it far less likely Mr. Shvartsman will engage in insider trading in the future, or that he would ever be given any opportunity to do so – in particular, the SEC's enforcement action against him will effectively brand him a high-risk client that broker/dealers will avoid and supervise closely. This will make it difficult for Mr. Shvartsman to trade illegally again, if he is able to trade in securities at all.

Moreover, Mr. Shvartsman's personal history and characteristics as set forth above and in the PSR indicate that there is little chance that Mr. Shvartsman will commit additional crimes. Mr. Shvartsman is a first-time offender with zero criminal history points and no prior arrests and "[t]he empirical evidence shows that criminal history as a risk measurement tool has statistically significant power in distinguishing between recidivists and non-recidivists." USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 15 (May 2004). Data collected and analyzed by the United States Sentencing Commission for its comprehensive 2003 recidivism study shows that the reconviction recidivism rate for defendants with zero criminal history points and no prior arrests is only 2.5%, and the primary recidivism rate – including re-arrest and supervised release and probation violations – is 6.8%. USSC, *Recidivism*

*and the First Offender*, 26 (May 2004).  This compares to 3.5% reconviction and 11.7% primary recidivism rates for all defendants with zero criminal history points, *Recidivism and the First Offender* at 26, and 4% reconviction and 13.8% primary recidivism rates for all Criminal History Category ("CHC") I defendants.  *Measuring Recidivism* at 21. By way of contrast, the reconviction and primary recidivism rates for all criminal defendants are 6.3% and 22.1% respectively. *Id.*  Mr. Shvartsman's risk of recidivism is further reduced as compared to all other defendants because his offense is non-violent, in the year prior to the instant arrest he was employed, and did not abuse drugs,[9] and is now almost 50 years old. *Id.* at 28-29.  According to the statistical tables, the chances that Mr. Shvartsman will re-offend are so vanishingly small that we respectfully submit this factor is of no consequence in deciding Mr. Shvartsman's sentence.

The single most important factor to take into consideration, however, in determining that Mr. Shvartsman is unlikely to engage in additional criminal conduct is the support he finds in those who are near to him.  The Court can see in the attached letters of support that Mr. Shvartsman has a close-knit support network, consisting of his family, friends and employees.

---

[9] Primary recidivism rate for CHC I defendants is 10.8%.

With this sort of support in his community, the chances that Mr. Shvartsman will re-offend are almost zero.

18 U.S.C § 3553(a)(2)(D) speaks of the need for a sentence to "provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner." We respectfully submit that a term of incarceration is not needed to provide Mr. Shvartsman with education or vocational training – he is a successful business executive, and he does not need "educational or vocational training" supplied by the BOP. Instead, Mr. Shvartsman will do best if he is permitted to keep his connections to his family, businesses and community intact, with a sentence of home confinement.

Nor is a term of incarceration necessary to ensure that Mr. Shvartsman will receive necessary medical care. Quite the contrary. Mr. Shvartsman has a significant health issue to deal with – he has recently been diagnosed with Crohn's disease. See PSR, p. 18; Ex. M. He will do far better if he is treated by his personal physicians rather than the Bureau of Prisons' health services. Thus, an analysis of 18 U.S.C § 3553(a)(2)(D) also suggests that a sentence of incarceration is unnecessary and could be counterproductive in this case.

18 U.S.C. § 3553(a)(6) requires the Court to consider whether the sentence it imposes will result in an "unwarranted sentencing disparity." In

this case, imposing a significant term of home confinement followed by a three-year term of supervised release on Mr. Shvartsman will not result in an "unwarranted sentence disparity" as compared with the sentences imposed on similarly situated "white collar" defendants generally, and with the other defendants in this case, all of whom are likely to receive sentences that include a modest jail sentence, or no jail sentence at all. Indeed, a sentence of home confinement is similar to a modest sentence of imprisonment at a federal minimum security camp, so it is an appropriate sentence for this defendant because he is not eligible to serve his sentence in a federal prison camp, as a citizen can.

Moreover, as is noted above, a downward variance from the Sentencing Guidelines sentencing range is fairly common in cases like this one, and Section 5C1.1 explicitly recognizes that sentences in cases like this one do not need to include incarceration in every case. Mr. Shvartsman respectfully submits that the sentence he proposes is an appropriate one, which will harmonize with other sentences imposed in similar cases, as reported by the Sentencing Commission. See Exhibit BB.

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense."

In this case, the PSR acknowledges that restitution "is not an issue in this case" because it is impossible to identify any specific victims of Mr.

Shvartsman's crime, and it is even more difficult to quantify the harm done to them.  PSR, page 26.  The Court is required to impose a $4.6 million forfeiture judgment however, which Mr. Shvartsman will struggle to pay for the next 20 years or more.  If the Department of Justice applies its restoration policy to these funds, they may be distributed in the future to any identified victims of Mr. Shvartsman's crime.  Obviously, Mr. Shvartsman will be much better able to make payments on the forfeiture judgment if he is not incarcerated because he will be better able to manage Source Furniture and earn the funds necessary to make those payments.  So, this factor also weighs in favor of a sentence that does not include incarceration.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a sentence that combines a lengthy term of home detention with a three-year term of supervised release in this case.

## POINT III

## ISSUES THAT CONCERN FINANCIAL PENALTIES
## TO BE IMPOSED ON MR. SHVARTSMAN

Mr. Shvartsman's conviction exposes him to forfeiture and a possible fine.

With respect to forfeiture, the Defendant has agreed to forfeit $4.6 million, which corresponds to the proceeds of his illicit trades. Mr. Shvartsman does not have $4.6 million in liquid assets, so the Court should simply enter a forfeiture judgment against him in that amount.

We respectfully request that the Court direct the Department of Justice to apply its restoration policy to any forfeiture payments made by Mr. Shvartsman, so that the funds paid by Mr. Shvartsman in connection with the forfeiture will be returned to any victims of the insider trading scheme that the Department of Justice is able to identify. That is the just thing to do.

The Court should not impose a fine on Mr. Shvartsman, because he will be subject to such a large forfeiture judgment. In these circumstances, Mr. Shvartsman submits that the imposition of a fine is not necessary – it would just be piling on. However, if the Court believes it must impose a fine, Mr. Shvartsman submits that the minimum fine ($15,000) required by the Sentencing Guidelines would be more than enough. PSR, page 26.

Imposing a larger fine will simply make it more difficult for Mr. Shvartsman to pay the forfeiture judgment and would therefore be counterproductive.

Finally, Mr. Shvartsman respectfully requests that the Court waive interest on any financial penalty imposed on him.

## **CONCLUSION**

For all the foregoing reasons, Gerald Shvartsman respectfully requests that the Court impose a sentence on him that is just, and he contends that such a sentence should include a term of 18 months of home confinement in lieu of incarceration in this case.

Dated: October __, 2024
       New York, New York

                      Respectfully Submitted:

                      SERCARZ & RIOPELLE, LLP

                      /S/*ROLAND GUSTAF RIOPELLE*
                      Roland Gustaf Riopelle (RR-2950)
                      SERCARZ & RIOPELLE, LLP
                      950 Third Avenue, 31st Floor
                      New York, NY 10022
                      Tel: 212-586-4900
                      Fax: 212-586-1234
                      Email: Rriopelle@Sercarzandriopelle.com
                      Attorney for Defendant,
                      **GERALD SHVARTSMAN**