

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 9, 2024

**VIA ECF**

The Honorable Lewis J. Liman
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

     **Re:**    ***United States v. Gerald Shvartsman*, S1 23 Cr. 307 (LJL)**

Dear Judge Liman:

     The Government respectfully submitted this memorandum in advance of the October 16, 2024 sentencing for defendant Gerald Shvartsman. Shvartsman learned valuable, confidential information about an impending potential merger between a blank-check SPAC (DWAC) and Trump Media. He misappropriated that information and made almost $5 million illegally trading in DWAC warrants. His co-conspirators, including people Shvartsman personally tipped, made millions more. The scheme involved Shvartsman misappropriating confidential information he received directly from DWAC after signing an NDA forbidding him from trading on that information, as well additional information about the likelihood and timing of the Trump Media merger that he and his brother, Michael Shvartsman, obtained from their mole on the DWAC board—Michael's employee, Bruce Garelick. For the reasons set forth below, the Government respectfully submits that a sentence of at least 24 months' imprisonment would be sufficient but not greater than necessary, particularly in light of Shvartsman's brazen corruption and greed.

**I.**    **Background**

    **A.**    **The Offense Conduct**

     The defendant and his co-conspirators, including his brother, Michael Shvartsman, made tens of millions of dollars in illegal profits by trading in the open-market securities of Digital World Acquisition Corporation ("DWAC"). In June 2021, the defendant and his brother were pitched to invest in DWAC—a special purpose acquisition corporation, or "SPAC"—by DWAC's CEO, Patrick Orlando. Orlando came to Michael Shvartsman's offices in South Florida to present to the Shvartsman brothers in person. Unlike most blank-check SPACs whose investors are generally clueless as to merger targets, this pitch included the possibility of a desirable target. Orlando explained that he had an existing business relationship with former President Donald J. Trump through another SPAC Orlando had established, Benessere. Orlando told the Shvartsmans that, rather than Benessere, DWAC might be the company to profit from this relationship and could

potentially merge with Trump's company, Trump Media and Technology Group, which owned the Truth Social social media company.

Before receiving this highly confidential, highly valuable information, Shvartsman signed confidentiality agreements with both DWAC and Benessere. Those confidentiality agreements stated, in sum and substance, that the defendant could use the information provided by Orlando only to decide whether to invest directly in the SPAC, that Shvartsman could not disclose material non-public information he learned from Benessere or DWAC to others, and that he could not use it to engage in securities trading on the open market on the basis of material non-public information.

Following the pitch meeting, Michael Shvartsman agreed to assemble a consortium of investors. Michael Shvartsman, Gerald Shvartsman, and the Chief Strategy Officer and Investment Officer of Michael Shvartsman's investment company, Rocket One, gathered a consortium of investors who made millions in legitimate pre-IPO investments in DWAC. Michael Shvartsman also nominated Garelick to DWAC's board of directors to tend to the brothers' investments and ensure that they would profit.

After DWAC went public in September 2021, Garelick, as a DWAC director, learned additional material non-public information about DWAC's negotiations with Trump Media. For example, Garelick learned confidential information about the status of merger negotiations between DWAC and Trump Media, the timing of a letter of intent and merger agreement, deal terms, and a likely closing date. After learning this material non-public information through his role on DWAC's board, Garelick provided updates to Michael Shvartsman about the status of the DWAC-Trump Media merger negotiations and the timing of a public merger announcement. Garelick encouraged Michael Shvartsman and another insider, Eric Hannelius, to purchase additional warrants in DWAC. Michael Shvartsman, in turn, passed Garelick's information on to Gerald Shvartsman.

Gerald Shvartsman, armed with the inside information he learned from Orlando, supplemented by tips passed from Garelick, then made several well-timed, massive purchases of publicly trading DWAC securities, all in violation of the non-disclosure agreements he had entered.

Specifically, after DWAC executed a letter of intent with Trump Media on or around September 23, 2021, Garelick conveyed material non-public information to Michael Shvartsman and encouraged him to buy DWAC securities. On October 1, 2021, once DWAC warrants began trading on the Nasdaq exchange, Michael Shvartsman purchased 2,000,000 DWAC warrants over three days.

On October 6, shortly after Michael Shvartsman finished purchasing his warrants, he tipped Gerald Shvartsman. Gerald Shvartsman contacted his broker that same day and placed an order for 300,000 DWAC warrants, which he purchased over the next two days. Less than two weeks later—and just two days before the merger was announced publicly—on October 18, 2021, Shvartsman received additional inside information from Michael Shvartsman about the timing of the announcement and purchased another 100,000 warrants. As Gerald Shvartsman stockpiled

these DWAC warrants, the public was entirely ignorant of DWAC's merger target, viewing DWAC as just another blank-check SPAC.

In addition to his own purchases, Gerald Shvartsman provided material nonpublic information about the impending merger to two employees of his furniture supply store so that they could use the information to make their own profitable trades: Netanel Suissa and Adrian Lopez Torres.

On October 19, 2021, Shvartsman called Suissa and told him to buy DWAC warrants because DWAC was going to merge with former President Trump's media company, the merger had been approved, the merger would be announced sometime in the next two weeks, and Shvartsman and his brother had already invested millions. Based on this tip, on October 19, 2021, Suissa purchased approximately 1,301 DWAC shares on the open market prior to the announcement of the Trump Media merger. Suissa also told two of his friends about the tip, and both of them traded in DWAC's stock prior to the merger announcement.

The same day he tipped Suissa, on October 19, 2021, Gerald Shvartsman called Lopez Torres, another of his employees, and told him to buy DWAC warrants because DWAC was going to announce that it was merging with Trump Media within the next two weeks. The same day, Lopez Torres purchased approximately 100,000 DWAC warrants. Lopez Torres also told his father and a friend about the tip, both of whom bought DWAC warrants prior to the Trump Media merger announcement.

On about October 20, 2021, after the close of trading, a spokesperson for former President Trump posted a press release to Twitter announcing the planned merger of DWAC and Trump Media. After the public announcement of the DWAC-Trump Media merger agreement, the share and warrant prices of DWAC securities skyrocketed. DWAC warrants went from trading for less than a dollar prior to the merger announcement to a daily high of $14.49 on October 21 and a daily high of $79.22 on October 22. This was a more than 18,000% increase in a two-day span.

Gerald Shvartsman sold the DWAC securities he purchased on the open market for a profit of approximately $4.6 million. His co-defendants, Michael Shvartsman and Bruce Garelick, sold the DWAC securities they had purchased on the open market for profits of approximately $18.2 million and $49,702, respectively. Shvartsman's friend and co-investor, Anton Postolnikov, sold his open market DWAC securities for a profit of approximately $14.5 million. Shvartsman's direct tippees, Lopez Torres and Suissa, sold their securities for profits of approximately $404,000 profit, and $16,000 profit, respectively. Lopez Torres and Suissa's tippees, in turn made approximately $1.6 million in profit trading in DWAC securities. And Michael Shvartsman's and Garelick's other tippees—business associates and friends—made an additional approximately $1.5 million in profits. In total, the tipping chain from Gerald Shvartsman and his co-defendants netted nearly $40 million in illegal profits—a gargantuan sum. *Cf. United States v. Rajaratnam*, 09 Cr. 1184 (RJH) (attributing approximately $66 million in gains to Raj Rajartanam's insider trading scheme).[1]

---

[1] The loss amount in the parties' Stipulated Guidelines Range of approximately $5 million (PSR ¶ 9(c) & n.4), reflects the profits attributable to the defendant personally and his direct tippees,

In June 2022, the Government approached several subjects of the investigation, including Gerald Shvartsman and Lopez Torres. Lopez Torres agreed to make a recorded call with Shvartsman, acting at the direction of law enforcement. When Lopez Torres called Shvartsman, Shvartsman became concerned about law enforcement overhearing their conversation, asking Lopez Torres to take him off speakerphone and switch to a video call to show him who else was in the room. When Lopez Torres asked Shvartsman about telling him to trade DWAC shortly before the news of the DWAC-Trump Media merger broke, Shvartsman responded that it was "just a coincidence." Shvartsman also told Lopez Torres that they were all in the "same boat" and would use "one attorney."

### B.    The Defendant's Plea, Guidelines Range, and Forfeiture

On February 6, 2024, the defendant was charged in the S1 superseding indictment (the "Indictment") in five counts: one counts of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), three counts of Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Counts Four, Eight, and Nine), and one count of Title 18 securities fraud, in violation of 18 U.S.C. § 1348 (Count Ten). On April 3, 2024, approximately four weeks before trial, the defendant pled guilty, pursuant to a plea agreement, to securities fraud, as charged in Count Four of the Indictment. (PSR ¶¶ 1-9.)

As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Range is 37 to 46 months' imprisonment. (PSR ¶¶ 7, 106.)[2] Probation recommends the defendant be sentenced to a below-Guidelines sentence of a year and a day of imprisonment. (PSR at 35.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $4.6 million (PSR ¶ 117), and the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment.

## II.    The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

---

Suissa and Torres, as the fair approximation of "reasonably foreseeable pecuniary" gain attributable to the defendant. *See* U.S.S.G. §§ 2B1.4(b)(1) & 2B1.1, application note 3(A).

[2] The defendant's submission notes an unusual interaction with a Pretrial Services Officer in Florida, which he previously reported to the Government. (Def. Mem. at 3 n.1). The Government has no further information to provide the Court at this time, but is not aware of this interaction in any way influencing or improperly affecting the defendant's Presentence Report or Probation's recommendation to this Court.

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## III.  The Court Should Impose a Sentence of at Least Two Years

A sentence of imprisonment below the Stipulated Guidelines Range of at least 24 months' imprisonment would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A.  A Sentence of at Least Two Years Is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

First, a custodial sentence of at least two years is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant, based on his wealth, status, and connections, was afforded an exclusive opportunity not available to ordinary investors. He was given the opportunity to make a pre-IPO investment in a SPAC with an inside track to merge with former President Trump's social medial company. But that legal, exclusive opportunity was not enough to satisfy the defendant's greed. Shvartsman, his brother, Garelick, and their confederates used the explosive, confidential information they obtained in connection with that investment opportunity to illegally add to their profits by purchasing cheap, unrestricted open market warrants that skyrocketed in value when the rest of the world learned what the conspirators already knew was coming.

The defendant is a wealthy, successful businessman. He reports an annual income in excess of $600,000 and resides in a more than 6,000 square foot waterfront mansion. He had no need for these additional profits. His engagement in this scheme was driven by pure greed.

Case 1:23-cr-00307-LJL    Document 219    Filed 10/09/24    Page 6 of 9

The defendant personally made $4.6 million in illegal profits—a huge sum. His brother, friends, and associates made tens of millions more. Shvartsman not only misappropriated this information for his own personal gain, he passed that same valuable information on to his employees, who in turn passed it on to their friends and family, netting additional illegal profits through their membership in the insider trading ring. The defendant knew what he was doing was wrong, and knew he was violating the promises he made to keep the information confidential and not use it.

This corruption—wealthy individuals further illegally enriching themselves when they have already been presented with opportunities beyond the reach of ordinary investors—is within the heartland of the kind of serious securities fraud that warrants a substantial sentence. Insider trading of this form "creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell." *United States v. Collins*, No. 18 Cr. 567 (VSB) (Jan. 17, 2020), Sent. Tr. at 87-88. Insider trading also "appropriate[s] some part of the returns … at the expense of other shareholders" and "tends to discourage corporate investment and reduce the economic efficiency of corporate behavior." Michael Manove, *The Harm From Insider Trading and Informed Speculation*, The Quarterly Journal of Economics (Nov. 1989). Because of the economic harm caused by insider trading, and because "[o]ur markets are … such an important part of the fabric of our economic life," it is important to "punish those who would hurt the integrity of that system." *United States v. Wong*, No. 22 Cr. 395 (ER) (Jan. 26, 2024), Sent. Tr. at 24. Moreover, in addition to harming investors and the stock market generally, Shvartsman's misappropriation of confidential information from DWAC harmed the company itself, which, as Judge Rakoff has described, is "the functional equivalent of stabbing [the victim company] in the back." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). In short, the serious nature of the harm of insider trading demands punishment.

The defendant argues for a downward variance in part because he contends the Guidelines loss calculation overstates the seriousness of his offense, citing several decisions that are routinely cited by defendants for the proposition that the fraud loss table overstates the seriousness of offenses. (Def. Mem. at 34-39). That criticism, however, is misplaced here. The loss Guidelines are often critiqued in situations involving a large corporate fraud where a decrease in a public company's share price can result in a loss untethered to the defendant's conduct or personal gain, here the "gain" amount reflects the actual amount that Shvartsman and his direct tippees gained from his participation in insider trading—and it *excludes* the tens of millions of dollars that others in the same tipping chain, including his brother and his friend, Anton Postolnikov, made. Indeed, the defendant's claim that the gain figure is overstated because the defendant "could not control the trading of his tippees" (Def. Mem. 36), carries little weight here where the overwhelming portion of the gain attributable to the defendant is his own illegal approximately $4.6 million gain. And in any event, even if the defendant's arguments concerning the Guidelines had some credence, the Government agrees that some form of a variance is appropriate here.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. As "insider trading is not only a sophisticated form of cheating but also a fundamental breach of trust and confidence …

meaningful punishment is … necessary to reaffirm society's deep-seated need to see justice triumphant," and "[n]o sentence of probation, or anything close to it, could serve this purpose." *Gupta*, 904 F. Supp. 2d at 355. Justice requires that Shvartsman be punished with an incarceratory sentence.

## B.  Deterrence Warrants an Incarceratory Sentence

Second, general deterrence is important in this case. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *Gupta*, 904 F. Supp. 2d at 355 ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

For those reasons, it is important here to impose a sentence that will deter future insider trading. While a "relatively modest prison term" may be sufficient in some cases, non-incarceratory sentences "totally fail to send this message." *Gupta*, 904 F. Supp. 2d at 355. The potential messages that could be inferred from this case, depending on the sentence, illustrate the point. If, on the one hand, Shvartsman is sentenced to a term of incarceration, and one commensurate with the defendant's conduct, it will send a message to other individuals with access to confidential information that insider trading will result in prison time. But, on the other hand, a noncustodial sentence may result in the wrong message: that insider trading is not serious or, even worse, that individuals with privileged access to confidential information are able to use their advantages to escape meaningful consequences. The fact that this case has resulted in press coverage does not alone serve a deterrent purpose. *United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). Instead, "because the case had attracted an unusually large amount of publicity," it "could have a powerful general deterrent effect." *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017).

The need for both general and specific deterrence here is heightened by Shvartsman's actions to avoid detection by law enforcement even after he learned of the investigation. In June 2022, when Lopez Torres, acting at the direction of law enforcement, called Shvartsman to discuss their insider trading, Shvartsman took steps to ensure he was not being monitored by law enforcement and would not incriminate himself. In this conversation with Lopez Torres, Shvartsman remarked on the "coincidence" their profitable DWAC trades.

In sum, deterrence is important in this case. Without a significant sentence attached to insider trading, the relative simplicity of committing the crime and the challenge of detecting it would incentivize those similarly situated to the defendant to engage in similar conduct. Shvartsman's sentence must also therefore reflect an emphasis on general deterrence that is commensurate with the difficulty of detecting and proving illegal insider trading. As Judge Rakoff cautioned in *Gupta*, defendants situated similarly to the defendant must be made aware that "when you get caught, you will go to jail." 904 F. Supp. 2d at 355. Only a serious sentence, one that sends the message that insider trading will result in prison time, would adequately ensure that those who would be tempted by a similar path understand the true consequences of such conduct.

## C.  A Sentence of at Least Two Years Is Necessary to Avoid Unwarranted Sentencing Disparities

Third, relative culpability and the defendant's personal characteristics warrant a substantial sentence within the Guidelines Range. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). Although, as the Second Circuit has repeatedly observed, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Here, when comparing the defendant's case to other insider trading defendants *nationwide*, or at least across this district, the need to avoid unwarranted sentencing disparities requires the imposition of an incarceratory sentence since most insider trading defendants are sentenced to prison. Indeed, the defendant made millions more than many other defendants in this District who have been sentenced to substantial jail time. *See, e.g.*, *United States v. Viggiano*, No. 23 Cr. 497 (VEC) (defendant who received $35,000 in kickbacks for illegal tips sentenced to 28 months' imprisonment following guilty plea); *United States v. Forlano*, No. 23 Cr. 497 (VEC) (defendant who realized approximately $100,000 in profits from insider trading scheme sentenced to 13 months' imprisonment following guilty plea); *United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant who realized insider trading profits of approximately $4.8 million for himself and his family sentenced to 28 months' imprisonment following early guilty plea);*United States v. Markin*, No. 22 Cr. 395 (ER) (tipper in insider trading scheme who realized profits of approximately $80,000 sentenced to 15 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Kakkera*, No. 22 Cr. 398 (GHW) (18 month sentence after guilty plea); *United States v. Dikshit*, No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant in front running scheme realizing profits of approximately $8.56 million sentenced to 33 months'

imprisonment following pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment following guilty plea); *United States v. Saeedi*, 22 Cr. 398 (GHW) (defendant who proffered with the government sentenced to 5 months' imprisonment with 30 to 37 month Guidelines range); *United States v. Buyer*, No. 22 Cr. 397 (RMB) (defendant who realized approximately $476,000 in profits in insider trading scheme sentenced to 22 months' imprisonment following trial).

The defendant argues that, unlike his co-defendants Michael Shvartsman and Bruce Garelick, the defendant was not a sophisticated financial professional, was not a director of DWAC, and accepted responsibility for his conduct. (Def. Mem. at 12-16). The Government agrees that, relative to his co-defendants, the defendant is the least culpable of the three defendants who will be sentenced by the Court. That culpability is reflected in their relative Guidelines ranges. The Guidelines range for Michael Shvartsman is 46-57 months' imprisonment; Probation recommends a Guidelines sentence. The Guidelines range for Bruce Garelick is 108-135 months' imprisonment; Probation has not issued a recommendation yet. Moreover, the defendant fairly notes that, as a non-citizen, his prison time will likely be harder than a U.S. citizen and he faces likely immigration consequences as a result of his conviction. Taking all of these factors into account, as well as the other personal circumstances discussed at length in the defendant's submission, the Government submits that a substantial, but below Guidelines, sentence of at least 24 months' imprisonment would fairly balance the relevant Section 3553(a) factors, and be sufficient but not greater than necessary to comply with those factors.

## IV.    Conclusion

For the reasons set forth above, the Government respectfully submits that a below-Guidelines sentence of 24 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
Daniel G. Nessim/Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-2486/-1046